UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DARRELL B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:18 CV 89 (JMB) |
| | ) | |
| ANDREW M. SAUL,[1] | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I. Procedural History

On September 10, 2015, plaintiff Darrell B. protectively filed applications for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of December 5, 2014.[2] (Tr. 186, 189-90, 191-94). Plaintiff subsequently amended the alleged onset date to May 25, 2015. (Tr. 209). After plaintiff's applications were denied on initial consideration (Tr. 117-21), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 124-25).

_____

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Deputy Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] Plaintiff previously filed an application for disability insurance benefits in 2012. (Tr. 86). An ALJ denied that application on December 5, 2014. (Tr. 72-84).

Plaintiff and counsel appeared for a hearing on October 12, 2017. (Tr. 32-71). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Anne H. Darnell, M.Ed. The ALJ issued a decision denying plaintiff's applications on January 19, 2018. (Tr. 15-26). The Appeals Council denied plaintiff's request for review on August 18, 2018. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff, who was born in May 1965, was 50 years old on the amended alleged onset date. In September 2015, when he filed his applications, he lived with his parents on their farm. (Tr. 251). He had a high school diploma and worked for 21 years as a union welder before retraining as an HVAC technician. He also worked as a welding instructor and at an auto parts store. (Tr. 215, 440, 61). Plaintiff listed his impairments as severe back pain, back problems, arthritis, nerve damage, muscle spasms, bipolar, manic depression, and migraines. (Tr. 214). His medications included baclofen and hydrocodone for pain, trazodone for sleep, Depakote to stabilize moods, Topamax for bipolar disorder, medication to treat high blood pressure, and injections for migraines. (Tr. 217).

In his October 2015 Function Report (Tr. 250-58), plaintiff stated that he was unable to work due to back pain and bipolar disorder. His pain interfered with his sleep and kept him from doing farm work or other labor. He did other household chores to assist his parents, including laundry, mowing, and repairs. He was able to drive and go to the grocery store, where he used a motorized cart. He was able to manage financial accounts. His attention was limited to three to five minutes and he had short-term memory problems.

Plaintiff described his activities with others as watching movies, playing board games or cards, and having conversations, including on the telephone. He was no longer able to hike, camp, ride motorcycles, restore cars, bowl, or spend time with kids. He had a short temper, which he attributed to his extreme pain and mental illness. He had been fired from his auto parts job due to his inability to relate to other employees. Plaintiff had difficulties with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, climbing stairs, remembering, completing tasks, concentrating, understanding, using his hands, and getting along with others. His ability to follow instructions was limited by his ADHD and short-term memory loss. He could walk on level ground for 50 to 100 feet before needing to rest. He used a cane on occasion.

Plaintiff's mother Pamela completed a Third Party Function Report. (Tr. 234-41). She stated that plaintiff was no longer able to work, lift, stretch, bend, or control his emotions. He was only able to handle small jobs and had to rest after doing household chores. Although plaintiff was able to go out on his own, she did not think he should do so because he had trouble with concentration and memory. He went shopping for food twice a month. Her son's pain and mental disorders had completely changed his personality, causing a lot of stress with his family and friends. She described him as short-tempered and occasionally unreasonable. His pain and migraines caused his emotions to "roller coaster" and his unpredictable behavior made it impossible for him to find employment and support himself. She opined that he could lift no more than 3 to 5 pounds and stated that he used a cane. The ALJ gave limited weight to Ms. B.'s description of plaintiff's physical limitations as inconsistent with plaintiff's medical examinations. The ALJ gave greater weight to her description of plaintiff's daily activities,

including the ability to do occasional yard work, clean his room, do laundry, drive, shop for groceries, spend time with others, and manage finances. (Tr. 24)

By the time of the October 2017 hearing, plaintiff's parents had sold the family farm and moved to Florida. Plaintiff and his girlfriend lived in a trailer on a piece of property he owned with his sister, who lived in an adjacent trailer with her son. (Tr. 49-51).

Plaintiff testified that he sustained nerve damage during back surgery in 2012, causing numbness in his right leg and foot. The outside edge of his right foot was numb all the time, altering his balance. (Tr. 38-39). If he twisted or sat the wrong way, his leg went numb and he collapsed. He had shooting pains down the back of his right leg and suffered back spasms if he stood for any length of time. (Tr. 39-40). Sitting hurt more than standing and the only position in which he could comfortably sit was in a recliner with his feet elevated. (Tr. 40, 68). When he went grocery shopping, he leaned on the cart and used it like a walker. At the time of the hearing, he had reapplied for Medicaid. He managed his musculoskeletal pain with nonnarcotic muscle relaxers and Advil. (Tr. 46). Twice a week, plaintiff got debilitating migraine headaches that lasted between one and three days. He sat in a quiet dark room with a cool cloth on his head and took medication that helped him sleep but caused him to feel hungover. He used to receive injections for migraines but found them too painful. (Tr. 45-47). Plaintiff also took medication to treat high blood pressure, which he stated was caused by his 2012 back surgery.[3] (Tr. 56). Finally, he had a lifelong 75% loss of hearing in his right ear. (Tr. 58). Plaintiff's physical impairments caused him some difficulty with self-care. In particular, he used a shower chair to avoid slipping and he had trouble putting on shoes and socks. The heaviest weight he could lift was a gallon of milk.

---

[3] Plaintiff was found to have high blood pressure at his preoperative examination. (Tr. 513).

Plaintiff testified that he was constantly angry as a result of his mental impairments. (Tr. 42). He took medication that reduced his temper outbursts but made him "wander around like a mindless little drone." (Tr. 43). As discussed below, plaintiff was admitted to a psychiatric unit in December 2014 after texting suicidal and homicidal statements to a friend who then called 911. At his hearing, plaintiff testified that he was asleep when the police came to his home in tactical gear.[4] They used physical force to restrain him and transport him to the emergency room, where he remained in restraints on the floor wearing only his underwear. (Tr. 53-55). He testified that he continued to have nightmares and paranoid feelings arising from this incident. Plaintiff also testified that he had heard muffled voices and music since he was a child. (Tr. 59). He told treatment providers that he was uncertain whether these occurrences were due to his hearing loss or were truly auditory hallucinations.

Plaintiff testified that he did not enjoy watching television and only talked on the phone when someone called him. He usually sat and listened to music. (Tr. 43). He stated that, in the past, he drank beer to increase the effect of his nonnarcotic pain medication, but he quit because he was not "a drinker" and "never really drank." At the time of the hearing, he was taking a muscle relaxer that relieved his back pain and had not been drinking for about six months.[5] (Tr. 43-44). Plaintiff described repairs he was making on his trailer. He approached these repairs slowly, both to protect his back and because his medication made it difficult for him to concentrate. (Tr. 45).

---

[4] He also testified that this incident occurred right after his surgery and he was worried about his back. (Tr. 53). It actually took place more than two years after his surgery.

[5] A little more than three months before the hearing, on June 22, 2017, plaintiff told his psychiatrist that he drank "a couple of beers at night so [he could] sleep." (Tr. 556). In March 2017, plaintiff told the same provider that he drank 30 beers a week. (Tr. 553-55).

Vocational expert Ann Darnell, M.Ed., was asked to testify about the employment opportunities for a hypothetical person who was closely approaching advanced age, with a high school education and plaintiff's work history, who was limited to light work. Ms. Darnell was asked to assume that the individual could never climb ladders, ropes, and scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid exposure to environmental hazards, including vibration; and was limited to simple, routine, repetitive tasks, involving only simple decisions. Ms. Darnell was also asked to assume that the individual was limited to occasional interaction with supervisors and co-workers and no interaction with the general public. (Tr. 66-67). According to Ms. Darnell, such an individual would not be able to perform plaintiff's past work as a welder, HVAC technician, auto parts sales person, or welding instructor. Other work available in the national economy the individual could perform included warehouse checker, hand bander, and mail clerk. The individual would not be able to perform these jobs if he were limited to sedentary work. All work would be precluded if the individual were off-task 20 percent of the day due to psychological issues or medication side effects. (Tr. 67-68).

**B.    Medical Evidence**

Plaintiff begins his discussion of the medical record in May 2015 and the Court will do the same, with a brief synopsis of the earlier records included in the administrative transcript.

On October 16, 2012, Theodore J. Choma, M.D., performed a microdiscectomy to treat plaintiff's "massive" and "severely debilitating" disc herniation at L4-L5. (Tr. 288). Starting shortly after the surgery and continuing throughout the period under review, plaintiff complained of headaches and numbness in the toes of his right foot. (Tr. 522). A postoperative MRI disclosed moderate central canal and moderate-to-severe bilateral recess, mild-to-moderate

stenosis at the L4-L5 level, and mild lumbar spondylosis. (Tr. 524). He continued to have back pain, which Dr. Choma attributed to multilevel lumbar spondylosis that was not amenable to surgical intervention. (Tr. 525-26). Records from 2014 show that plaintiff was prescribed tramadol and hydrocodone for pain and Flexeril for muscle spasms. He was also started on medication to address hypertension. (Tr. 436, 426-31).

In December 2014, plaintiff was hospitalized on a 96-hour hold after he made threatening statements in text messages to a friend. (Tr. 316-59). He blamed his outbursts on intractable pain and numbness in his right leg which interfered with his sleep. He was also using alcohol and marijuana regularly. He was discharged with diagnoses of Adjustment Disorder with Depressed Mood, rule out Bipolar Disorder; and Pain Disorder, rule out Malingering Component. (Tr. 344). He was directed to enter pain management services and outpatient mental health treatment.

In January 2015, plaintiff sought emergency care for a headache with photophobia. (Tr. 365-72). A CT scan of his brain was negative. He was prescribed a beta blocker to address hypertension and migraines and an increased dose of hydrocodone for back pain. (Tr. 420-25). Also in January 2015, plaintiff entered into mental health treatment at Burrell Behavioral Health. (Tr. 458-61). He reported having mood swings, auditory hallucinations, poor sleep, and violent dreams; he also wished that he had not woken up from surgery. He received medication monitoring from Kristin Parkinson, M.D., who diagnosed plaintiff with Bipolar Affective Disorder I, Most Recent Episode Depressed, rule out Mood Disorder Secondary to Pain. He was also assigned a community support services worker. (Tr. 455-57, 452-54, 449-51).

In March 2015, plaintiff established primary care treatment with Christopher Hartigan, FNP, who prescribed a TENS unit and medication for migraines, hypertension, neuropathic pain,

and back pain. (Tr. 407-12; 400-06). X-rays of the lumbosacral and sacroiliac spine in April 2015 disclosed degenerative changes with preserved disc spaces and no evidence of sacroiliitis. (Tr. 488-91). An MRI of the brain disclosed no abnormalities. (Tr. 492). Plaintiff was offered, and refused, an injection to treat pain in the right sacroiliac joint. (Tr. 491, 450). On examination in mid-May 2015, plaintiff complained of headache pain, which he rated at level 9 on a 10-point scale. He had tenderness of the lumbar spine and moderate pain with motion. (Tr. 398). He had not started taking a medication prescribed to address his neuropathic pain. Two weeks later, Mr. Hartigan noted that plaintiff's hypertension was stable and his migraines were much improved. He still had not begun taking the neuropathy medication and Mr. Hartigan wanted plaintiff to reduce his use of hydrocodone. (Tr. 391-92). On June 23, 2015, Mr. Hartigan noted improvement in plaintiff's migraines and hypertension but he had fractured his ribs falling in the tub. Mr. Hartigan administered an injection of Toradol for pain. (Tr. 387-93, 373). Plaintiff was warned that "agitated phone calls with cursing" would "get [him] fired from Family Health Center." (Tr. 385).

In June 2015, plaintiff was transferred to Burrell Behavioral Health's Community Psychiatric Rehabilitation program, where he was seen by psychiatrist Laura E. Smith, D.O. (Tr. 445-48). He described a history of 25 to 30 concussions with loss of consciousness, sustained in a variety of motor bike, skateboard, roller blade, and motor vehicle accidents. During the session, he made "tirades" about "foreigners" stealing his job and benefits and blamed a "Mexican doctor" for thwarting his disability application by stating that plaintiff was "faking [his] back injury." (Tr. 445). He drank four beers a night. Upon review of systems, Dr. Smith noted that plaintiff had labile mood, anger outbursts, nightmares, sleep difficulty, and auditory hallucinations. His liver function tests were elevated. On mental status evaluation, plaintiff

appeared anxious at times and was easily irritated, though fairly cooperative.  He had a stiff gait and appeared to be in pain as he sat.  His speech was loud and he occasionally shouted.  Although he described his mood as "okay," his affect was labile, ranging from euthymic and jovial to extremely angry.  His thought processes were circumstantial and he was preoccupied with foreigners doing him harm.  He denied suicidal and homicidal ideation.  He had limited insight and partial judgment regarding his ranting and alcohol use.  He was alert and oriented, but his attention span and concentration were diminished.  Dr. Smith diagnosed plaintiff with Bipolar I Disorder (by history), rule out Mood Disorder, Secondary to Traumatic Brain Injury; Anxiety with PTSD Features, rule out PTSD; and rule out Alcohol Use Disorder.  He reported that high doses of Trazodone made him groggy and that Topamax helped reduce his headaches.  He was "very resistant" to taking medication in general but agreed to start Prazosin to treat nightmares.  Dr. Smith recommended that he increase the dosage of Topamax he was taking and reduce his alcohol use.  (Tr. 446).

In July 2015, plaintiff told Dr. Smith that his girlfriend tried to kill him by lowering a car on him as he was changing a tire.  (Tr. 442-44).  He also complained that he had failed a drug screen because she put drugs in his food, with the result that his Vicodin prescription was at risk of suspension.  He had anxiety related to a number of psychosocial stressors and had increased his daily beer intake to 5 or 6 a day.  He reported that he had not started taking Prazosin because he did not have any problems with nightmares and, further, he was sleeping 8 hours a night.  He had depressed and irritable mood with difficulty concentrating and passive suicidal thoughts in response to uncontrolled pain.  Once again, on mental status examination, plaintiff displayed labile affect, limited insight, and partial judgment.  His mood was depressed and irritable.  He was prescribed trazodone and Prazosin to use as needed and agreed to increase his Topamax but

refused all other mood stabilizers and antidepressants. The following month, he reported that he had not actually used the higher dosage of Topamax and Dr. Smith reduced the prescribed dose to reflect his actual use. (Tr. 439-41).

On July 23, 2015, Mr. Hartigan told plaintiff that he needed to have two clean urine screens before his pain medication could be renewed because the last screen showed methamphetamine and unprescribed oxycodone. (Tr. 374-79). On examination, he had tenderness of the lumbar spine. His migraines were stable but his depression was worse and he had gained two pounds.

In August 2015, Dr. Smith noted that plaintiff's referral to pain management services had been held up by lost medical records and that his Vicodin prescription was discontinued. (Tr. 439-41). He had "snapped" at Mr. Hartigan's office, but denied feeling any regret or need to apologize. He later apologized to Dr. Smith for being "loud and confrontational," attributing his behavior to pain.

On September 21, 2015, plaintiff was seen by S. Street, DO, at the Lordex Spine Center. (Tr. 472-74). He was accompanied by a case worker from Burrell Behavioral Health. Plaintiff reported worsening back pain with numbness in the side of his foot. He stated that other providers "tried to kill him" with treatments and that he had walked out when a specialist recommended injections. On examination, plaintiff was not in acute distress and had no overt pain behavior. He had a normal gait. He had a limited range of motion of his lumbar spine and complained of pain but had no tenderness on palpation. He did have tenderness over the right sacroiliac joint and pain over the lumbar facets. He had normal patellar reflexes and absent Achilles reflexes. He had full strength in the right lower extremity and slightly diminished strength in the left. Straight leg raising tests were negative on both sides. He was diagnosed

with lumbosacral spondylosis and sacroiliitis and offered nerve blocks, with the possibility of radio frequency ablation. Plaintiff became agitated and stated that he did not trust doctors. Dr. Street pointed out that his advice was the same as that given by at least two other physicians. Dr. Street suggested that plaintiff consider his options and return if he wanted further treatment. There are no records of additional contact with the Lordex Spine Center.

On October 1, 2015, plaintiff had a new patient office visit with Lawrence Lampton, M.D. (Tr. 475-76). The handwritten notes are largely illegible and the record contains no notes of further contact with Dr. Lampton.

Plaintiff began individual therapy with Katherine Ottofy, LCSW, on October 12, 2015. (Tr. 581-82). He met with her approximately every two weeks for the next two years, with a gap between July and September 2016. His goals for treatment were to learn stress management skills and improve his personal relationships. (Tr. 581-658).

On October 13, 2015, plaintiff returned to see Dr. Choma, who had performed his microdiscectomy in October 2012, for complaints of back pain and numbness, tingling, and weakness in his right leg. (Tr. 494-97). Dr. Choma noted that plaintiff's lack of medical insurance had prevented him from getting appropriate treatment for these symptoms following the 2012 surgery. Diclofenac helped a bit, but he had severe reactions to gabapentin and Lyrica, including diarrhea and vomiting. On examination, plaintiff was unable to toe walk, had lumbar pain with motion, full strength, and generally — but not completely — intact sensation. X-rays showed mild lumbar scoliosis at L2-3, lumbar spondylosis, disc space narrowing, and facet arthrosis. (Tr. 498). An MRI of the spine showed progression of spondylosis at L2-3, disc bulge and disc space narrowing, and foraminal narrowing. (Tr. 499-500). It was determined that the numbness in his right leg was not due to a stenotic lesion. (Tr. 501).

On October 22, 2015, Margaret Brothers, APN, became plaintiff's provider at Burrell Behavioral Health. (Tr. 478-81). Plaintiff reported that higher doses of Topamax made him feel mean and out of it but lower doses helped stabilize his mood. He stated that he snapped about once a week and became very angry, with screaming and agitation. Less often, he had crying spells that lasted as long as two hours. He reported feeling guilty, worthless, pathetic, and agitated or frustrated. He continued to describe hearing voices but wondered whether they were related to his 75% hearing loss in one ear. He reported a history of multiple traumas, including physical and emotional abuse within his family and sexual abuse at age 12. In addition, he was stabbed in the back by a girlfriend and was the target of a SWAT raid in the middle of the night. When his fiancée died of a heart attack shortly before their wedding date, he was initially arrested for her murder. He had nightmares and flashbacks and was hypervigilant, finding it hard to trust others. On mental status examination, plaintiff had excessive and rapid speech that was easily interrupted, difficulty concentrating, and fair to poor insight and judgment. He had depressed and anxious mood with congruent affect. He was diagnosed with Bipolar I Disorder, Most Recent Episode Depressed, Moderate, rule out with Psychotic Features; rule out Psychosis; rule out Mood Disorder, Secondary to Traumatic Brain Injury; PTSD; and Alcohol Use Disorder. Ms. Brothers prescribed Topamax at a reduced dosage and trazodone as needed for sleep, and discontinued Prazosin. Plaintiff was again advised to reduce or discontinue alcohol use.

Plaintiff returned to see Mr. Hartigan at the Family Health Center on October 22, 2015. (Tr. 482-87). He reported continued back pain that radiated to the right leg with tingling and weakness in his leg. His hypertension was stable. On examination, he had a rash on his arms and lumbar tenderness. His medications included diclofenac as needed for pain, hydrocodone, blood pressure medication, Sumavel injections as needed for migraines, the muscle relaxer

tizanidine, Topamax, and trazodone. He was given Depomedrol for the rash. The following month, Mr. Hartigan noted that plaintiff was suffering from nocturnal paresthesias and tingling and had insomnia. (Tr. 527-32). He recommended an epidural steroid injection at L4-5 to address plaintiff's continuing moderate-to-severe back pain and prescribed Belsomra for insomnia. Plaintiff underwent the injection a few days later. (Tr. 534-35).

On December 23, 2015, plaintiff told Ms. Brothers that he had not had any recent angry outbursts. (Tr. 538-40). He was working on his trailer but his progress was slow due to his back problems. He woke up every two hours due to pain or stress. He had stopped taking trazodone because it made him too groggy and he was planning to start taking Belsomra. He found therapy helpful and his mood and outlook were improved. He stated that he had racing thoughts, nightmares, flashbacks, and hypervigilance. Ms. Brown observed that he seemed less irritable and more at ease. She discontinued trazodone and advised him to keep taking Topamax and stop drinking. In January 2016, plaintiff told Mr. Hartigan that the Belsomra was not working. His urine screen was positive for methamphetamine and so he did not receive any narcotics for pain. (Tr. 574-80). There are no records of medical care for plaintiff's physical impairments until April 2017.

In February 2016, plaintiff told Ms. Brothers that he was under pressure from his parents to make his trailer habitable so that they could move to Florida. (Tr. 541-43). He was sleeping every other night, trying to stay up and finish his work on the trailer. He had thoughts of hurting others but no plans and had not been snapping at people. He rated his anxiety at level 7 on a 10-point scale. Plaintiff's caseworker reported that plaintiff was doing well on the current dose of Topamax. Buspar was added to address his anxiety. In March 2016, plaintiff reported that the Buspar was helping him to feel less stressed, irritable and agitated. (Tr. 544-46). He was

sleeping well and his concentration was better. His back pain prevented him from working on the trailer as much as he would like and his parents were annoyed by the lack of progress. His medications remained unchanged in May and June 2016. (Tr. 547-49, 550-52). In June, he reported that his overall mood was okay and his mother thought the Buspar was helping. He denied having mood swings and was less irritable and anxious. He was scheduled to return in July 2016 but did not seek medication management again until March 2017,[6] when he was evaluated by Samuel Temesgen, M.D. (Tr. 553-55). He stated that he was working on his trailer 25 hours a week and taking repair jobs to make money. He was doing well and rated his life at level 8 on a 10-point scale. Although he previously reported that Buspar was helpful, he now complained that it turned him into a mindless drone. He still had back pain but was not taking pain medication. Furthermore, he was sleeping well, although he had "weird" dreams. (Tr. 553). He denied suicidal or homicidal ideation. On examination, Dr. Temesgen noted that plaintiff was alert and oriented, extremely restless, made poor eye contact, and was superficially cooperative. His speech was a bit fast but his thought processes were logical and goal directed and he had good focus. His affect ranged from euthymic to irritable and his mood was "okay." His insight and judgment were fair. Dr. Temesgen discontinued Buspar and continued Topamax.

Plaintiff returned to the Family Health Center on April 18, 2017, where he was seen by Ameer Shams, M.D., for treatment of migraines, hypertension, tendonitis in his right elbow, hypoglycemia, and hyperlipidemia. (Tr. 566-73). Plaintiff complained of fatigue. On examination he had tenderness in his right elbow and swelling in his hands. The examination of his spine was normal. Dr. Shams ordered lab tests to determine the cause of plaintiff's fatigue but the results do not appear in the record and there was no further mention of fatigue when

---

[6] Plaintiff also missed two months of sessions with Ms. Ottofy but resumed biweekly therapy in September 2016. (Tr. 617-18).

plaintiff returned in July 2017. (Tr. 560-65). He complained of back pain and tingling in both hands. His hypertension was stable.

Plaintiff returned to see Dr. Temesgen in June 2017. (Tr. 556-57). He blamed Topamax for being easily distracted and unable to finish tasks. He believed that controlling his pain would help, but stated that he was unable to take pain medication. He was sleeping four hours a night, drinking beer so he could sleep, and hearing voices. On examination, he was less restless but made poor eye contact. He was oriented with good focus and his affect was irritable to euthymic. He agreed to continue taking Topamax, which he believed helped with his anger. He also agreed to be evaluated for adult ADHD. When plaintiff returned in August, he reported that he was feeling more stress. (Tr. 558-59). His parents were about to move away and he did not feel able to support himself. He believed the Topamax helped him to "mellow out." He also drank a 30-pack of beer every week for back pain. His mental status remained unchanged.

Plaintiff's parents moved away in mid-August 2017. He told Ms. Ottofy that he was working on his projects and figuring out a system for paying his bills. (Tr. 653-54, 655-56). In September 2017, Ms. Ottofy noted that plaintiff had been working to develop skills and improve his functioning in the areas of stress and anger management, communication skills, and boundary setting within interpersonal relationships. She described him as actively participating and engaged in therapy. (Tr. 659).

### 2. Opinion evidence

On December 22, 2015, State agency consultant Kenneth R. Smith, M.D., completed a physical residual functional capacity assessment based on a review of the record. (Tr. 92-94, 106-08). Dr. Smith noted that plaintiff was able to complete housework, mow, drive, shop, lift up to 15 pounds, and walk 100 feet. He further noted that in October 2015 plaintiff had full

strength throughout with normal reflexes and sensation. Dr. Smith opined that plaintiff was poorly credible and could occasionally lift or carry up to 20 pounds, frequently lift or carry up to 10 pounds, stand and/or walk for 6 hours in an 8-hour workday, and sit more than 6 hours on a sustained basis in an 8-hour day. The ALJ gave this portion of Dr. Smith's opinion great weight. Dr. Smith also found that plaintiff had no environmental restrictions. The ALJ discounted this portion of his opinion, finding that plaintiff's pain, decreased reflexes and sensation, and medication side effects warranted restrictions on his exposure to heights, moving machinery, vibration, and operating motor vehicles. (Tr. 24).

On January 4, 2016, State agency consultant Stanley Hutson, Ph.D., completed a Psychiatric Review Technique form, also based on a review of the record. (Tr. 90-92, 104-06). Dr. Hutson concluded that plaintiff had medically determinable impairments in the categories of 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders). Dr. Hutson noted that plaintiff was resistant to taking medications but was partially compliant with his psychotropic medications and that he had started individual therapy. He found that plaintiff had moderate restrictions in the activities of daily living; maintaining social functioning; and maintaining concentration, persistence, and pace. There was insufficient evidence regarding episodes of decompensation. In a mental residual functional capacity assessment (Tr. 94-96, 108-10), Dr. Hutson opined that plaintiff had no understanding and memory limitations. He was moderately limited in the ability to carry out detailed instructions. He was not significantly limited in the abilities to maintain a schedule, sustain a work routine, or complete a work schedule without unreasonable rest periods. He was moderately limited in some components of interacting with others in a work setting and adapting to changes. Dr. Hutson found that plaintiff was able to understand and remember instructions and complete

routine tasks, despite some difficulty with distraction and concentration. He had difficulty with frustration and temper and would benefit from having limited social interactions in a work setting. He was able to adapt to a work setting that had few changes in routine and few social demands. The ALJ gave great weight to Dr. Hutson's opinion regarding plaintiff's restrictions.[7] (Tr. 24).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that he is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability

---

[7] The ALJ noted that the regulations regarding paragraph B criteria had changed, which reduced the relevance of Dr. Hutson's paragraph B determinations, but did not affect his determinations regarding the severity of plaintiff's functional restrictions.

meets or equals a listed impairment.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process).  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942.  "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).  If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole.  Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).  In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff met the insured status requirements through June 30, 2017, and had not engaged in substantial gainful activity since May 25, 2015, the amended alleged onset date. (Tr. 17). At steps two and three, the ALJ found that plaintiff had severe impairments of lumbar degenerative disc disease and spondylosis status post-microdiscectomy, migraines, bipolar

disorder, substance-induced mood disorder, anxiety disorder, pain disorder, personality disorder, alcohol use disorder, and PTSD. Plaintiff had nonsevere impairments of hypertension, hyperlipidemia, sacroiliitis, history of idiopathic neuropathy, history of tennis elbow, and history of rib fractures. (Tr. 17-28). The ALJ found that plaintiff's allegations of ADHD, hand arthritis, and hearing loss were not medically determinable impairments. (Tr. 18). Plaintiff does not challenge the ALJ's determination of his severe impairments. The ALJ then determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.[8] (Tr. 18-20).

The ALJ next determined that plaintiff had the RFC to perform light work and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He could never climb ladders, ropes, or scaffolds, and needed to avoid environmental hazards, including "work in vibration." (Tr. 20). Furthermore, he was limited to performing simple, routine, repetitive tasks and simple work decisions. He could have occasional interaction with coworkers and no interaction with the general public. (Tr. 20-25). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's statements regarding his abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent" with the medical and other evidence. (Tr. 21).

---

[8] For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had mild limitations in understanding, remembering, or applying information. He had moderate limitations in his abilities to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. (Tr. 19). He did not satisfy the paragraph C criteria. (Tr. 19-20).

At step four, the ALJ concluded that plaintiff was unable to perform his past relevant work as an auto parts specialist, HVAC technician, welder, or welding teacher. (Tr. 25). He was in the "closely approaching advanced age" category on the alleged onset date, had at least a high school education, and was able to communicate in English. Id. The transferability of job skills was not material because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled regardless of whether he had transferable skills. Id. The ALJ found at step five that someone with plaintiff's age, education, work experience, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a warehouse checker, hand bander, and mail clerk. (Tr. 25-26). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from May 25, 2015, the amended alleged onset date, through January 19, 2018, the date of the decision. (Tr. 26).

## V.  Discussion

Plaintiff argues that the ALJ's determination that plaintiff had the RFC to perform light work is not supported by any medical evidence.[9]  In particular, he argues that the ALJ erred in relying on the opinions of the consultative State agency doctor in formulating the RFC.

The "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  SSR 96-8p, 1996 WL 374184 (July 2, 1996).  "[A]

---

[9] In the December 2015 decision issued on plaintiff's prior application, the ALJ determined that plaintiff was limited to sedentary work. (Tr. 78-82).  As plaintiff notes, if the ALJ in the current decision limited him to performing only sedentary work, he would be disabled under the Medical-Vocational Guidelines. 20 C.F.R. § 404, Subpt. P, App. 2, § 201.14.  The ALJ in this case conducted a *de novo* review of the evidence and was not bound by any prior determinations.  (Tr. 34).

claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (quotation and citation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). Nonetheless, there is no requirement that an RFC finding be supported by a specific medical opinion, Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), or, indeed, any medical opinion at all. See Stringer v. Berryhill, 700 F. App'x 566, 567 (8th Cir. 2017) (affirming ALJ's RFC determination even though there were no medical opinions). Furthermore, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC. Cox, 495 F.3d at 619; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original). The ALJ may also consider a claimant's daily activities, subjective allegations, and any other evidence of record when developing the RFC. Hartmann v. Berryhill, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing Cox, 495 F.3d at 619-20). And, even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox, 495 F.3d at 620; 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006). The burden is on the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523.

In determining plaintiff's physical RFC, the ALJ reviewed plaintiff's activities. The record establishes that plaintiff painted the bathroom in his trailer, changed electrical wiring, fixed leaking pipes, and did occasional repairs for money. The ALJ also reviewed the medical

evidence, summarizing the results of imaging studies, observations on physical examination, treatment history, and response to medications. Thus, the ALJ noted that, while October 2015 imaging studies showed progression of spondylosis and degenerative disc disease, it remained mild to moderate and brain scans were routinely negative. (Tr. 21, 498-500). The ALJ also noted that plaintiff's physical exams disclosed some reduction in strength, reflexes and sensation, with periodic tenderness on palpation and positive straight leg tests. Nonetheless, he was generally described as looking well and not in acute distress. He never sought emergency treatment for back pain and routinely refused prescribed injections.

The ALJ also considered the opinion evidence. The only medical opinion addressing plaintiff's physical limitations is that formulated by Dr. Smith, a State consultative expert, in December 2015. Plaintiff argues that the ALJ improperly gave great weight to the opinion of Dr. Smith. First, plaintiff argues, under SSR 96-8p, the opinions of nonexamining sources are not entitled to greater weight than a conflicting opinion from a treating physician. Walker v. Comm'r, Soc. Sec. Admin., 911 F.3d 550, 553 (8th Cir. 2018) (citation omitted) ("By contrast [with the controlling weight given to the well-supported opinions of treating physicians], the opinion of a consulting [source] who examines a claimant once or not at all does not generally constitute substantial evidence."). Here, however, no treating physician ever rendered an opinion regarding plaintiff's capacity to work, let alone an opinion that conflicts with that of Dr. Smith. Second, plaintiff argues, the consultative opinions were based on limited medical evidence. In this case, however, the ALJ considered the opinions in light of plaintiff's subsequent treatment in full and, furthermore, specifically discounted portions of Dr. Smith's opinion that did not take into account plaintiff's pain, periodic findings of reduced strength and sensation, and the side effects of medication.

Plaintiff alsoargues that the ALJ should have submitted additional evidence to Dr. Smith to obtain an updated opinion.  An ALJ is required to obtain an updated opinion from a medical expert only if the ALJ believes that the additional medical evidence might change the consultant's opinion.  Michael S. v. Berryhill, No. 17-CV-5586 (TNL), 2019 WL 1430138, at *10 (D. Minn. Mar. 29, 2019) (citing SSR 96-6p).  In light of the 15-month period during which plaintiff did not seek treatment for back pain or his other physical conditions, there is no reason to believe that the subsequent medical records would have altered Dr. Smith's opinion.  Plaintiff alternatively argues that the ALJ should have referred plaintiff for a consultative examination or contacted his treating physicians.  The ALJ did not have a duty to seek additional information from the treating physicians, because there were no undeveloped issues, nor was the ALJ required to order an additional consultative examination.  Duncan v. Saul, No. 4:18-CV-736 NAB, 2019 WL 4737117, at *4 (E.D. Mo. Sept. 27, 2019) (citing KKC ex rel. Stoner v. Colvin, 818 F.3d 364, 372 (8th Cir. 2016)).

Finally, plaintiff asserts that the ALJ's determination that plaintiff could not work "in vibration" is vague.  Defendant represents that the jobs identified by the vocational expert exclude exposure to vibration and thus there is no fatal ambiguity in the RFC.  [Doc. # 26 at 13].  Similarly, plaintiff's argument that the ALJ improperly substituted her opinion for that of his treating providers fails because, as noted above, no treating provider offered an opinion regarding plaintiff's capacity to work.

* * * * *

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

_**/s/ John M. Bodenhausen**_
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of December, 2019.